No. 20242.

WOLFF v. SHREVEPORT GAS, ELECTRIC LIGHT & POWER CO. et al.

(Jan. 10, 1916. Rehearing Denied Feb. 7, 1916.)

*(Syllabus by the Court.)*

1. GAS ⬤�longdash11—ORDINANCE REGULATING INSPECTION—OPERATION AND VALIDITY.

The purposes of the ordinance of the city of Shreveport of October 20, 1908, regulating the "inspection and testing of gas meters, gas piping, and installation of all kinds of gas apparatus," are to provide for the safety of the public and afford some protection to the consumer against insufficient service and overcharges; and the assumption that the city council, in passing the ordinance, attempted to devest the gas company of any of its property, or deny the right to inspect, or relieve it of liability for negligent handling of, the same, is unwarranted.

[Ed. Note.—For other cases, see Gas, Dec. Dig. ⬤�longdash11.]

2. GAS ⬤�longdash16 — DEFECTIVE PIPE — INJURY TO PEDESTRIAN—LIABILITY.

The company owns the service pipe from its main pipe to the meter through which it is measured and delivered to the consumer, and is responsible for its capacity to retain the gas conveyed through it; and the consumer is responsible for the condition of the pipes which supply the house, from the meter; and, when both service and supply, or house, pipes are allowed to deteriorate, and the gas, leaking from them, ignites and explodes, inflicting injury upon a passer-by in the street, the company is liable, in solido with the consumer, in damages.

[Ed. Note.—For other cases, see Gas, Cent. Dig. § 13; Dec. Dig. ⬤⟻16.]

3. CORPORATIONS ⬤⟻579—DISPOSITION OF ASSETS — LIABILITY FOR EXISTING CLAIMS — REORGANIZATION.

Where a gas, electric light and power company, after an explosion inflicting injuries for which it is liable in damages, makes a conveyance, omnium bonorum, to a new corporation, under circumstances which warrant the conclusion that the new company is merely a continuation or reorganization of the old company, the person injured may recover against either corporation, or both.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2307, 2309, 2313–2318; Dec. Dig. ⬤⟻579.]

4. CORPORATIONS ⬤⟻579—DISPOSITION OF ASSETS — LIABILITY FOR EXISTING CLAIMS — REORGANIZATION—BURDEN OF PROOF.

Where one corporation conveys all of its property, corporeal and incorporeal, including its business, to another, under circumstances which disclose the earmarks of a transaction between persons dealing with themselves, and the two corporations are sued, in tort, upon a claim which arose prior to such conveyance, the burden is thrown upon them (since they possess the information and the plaintiff can only obtain it from them) of showing that the conveyance was bona fide, for an adequate consideration, and not, in effect, a mere reorganization or merger of the old company into the new; and particularly is that true where the old corporation is created under the laws of this state, and the new, under the laws of another state.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2307, 2309, 2313–2318; Dec. Dig. ⬤⟻579.]

Appeal from First Judicial District Court, Parish of Caddo; T. F. Bell, Judge.

Action by Leopold Wolff against the Shreveport Gas, Electric Light & Power Company and others. From judgment for plaintiff, defendants appeal. Affirmed.

The following is the diagram referred to in the opinion:

Alexander & Wilkinson and E. W. & P. N. Browne, all of Shreveport, for appellants. Blanchard & Smith, of Shreveport, for appellee.

MONROE, C. J. The Shreveport Gas, Electric Light & Power Company, a corporation established under the laws of this state (hereafter designated as "Shreveport Company"), and the Southwestern Gas & Electric Company, a corporation established under the laws of the state of Delaware (hereafter designated as "Southwestern Company"), are appellants from a verdict and judgment condemning them, in solido, to pay to plaintiff the sum of $2,427 as damages resulting from personal injuries sustained by him in consequence of an explosion of gas, attributed to the negligence of the company first above named.

Plaintiff's original petition contains the following, among other, allegations, to wit:

"That the explosion was directly caused by an accumulation of natural gas that had leaked from the gas company's main pipe, * * * in Texas street, or from the said company's supply pipe that conveys the gas from the main pipe to the meters in the Chamberlain Café, * * * and that said gas accumulated under the floor of said building and had become ignited. * * * That the said leakage * * * and explosion * * * were due to the fault * * * of the Shreveport * * * Company, in this, to wit:

"That the said company had not made any inspection of its main pipe, nor its supply pipes that connect the buildings on Texas street, since the same had been laid, which was about 1875. That the said company had not made any provisions by which it might make a test or inspection of the said main pipe or supply pipes, without tearing up the street; i. e., that it had no appurtenances, such as shut-off valves, shut-off cocks, or other similar conveniences, by which it could get at said pipes in order to inspect them or to detect the leaks in them. That said company had no regular or efficient system of inspection of its main and appurtenant pipes by which it could ascertain and detect the rust, decay, and breaks in said iron pipes. * * * That said company should have installed heavier and stronger pipes, at the time that it contracted to convey natural gas. * * * That the pipes then in use were corroded and leaky. That the said pipes were intended to convey manufactured gas, and not natural gas, and therefore the joints were not threaded and fitted, as they should have been to hold natural gas. That the main pipe in Texas street and the supply lead to the Chamberlain Café had been in the earth since about the year 1875, and the same were

rusty, decayed, and leaky, and the said pipes did break and leak and are the direct and proximate cause of the gas accumulation under Chamberlain's Café, and that such gas * * * was the proximate cause of the explosion. That said company failed to install shut-off cocks at that establishment, as required by law. * * * That, since the explosion, * * * other explosions, at other establishments in the same vicinity, have occurred, * * * and that said explosions were also due to the leaks in the main and supply pipes of said company. * * * Petitioner shows that on October 28, 1912, the Shreveport * * * Company purported to sell all of its assets, of every nature, to the Southwestern * * * Company, incorporated under the laws of the state of Delaware, for * * * $1,000. * * * That the said Southwestern * * * Company is composed of practically the same parties who owned and composed the Shreveport * * * Company, and that, in reality, the alleged sale was a mere consolidation or reorganization, or * * * the Southwestern * * * Company is merely the reincarnation of the Shreveport * * * Company; or, in the event it should be held that the said Southwestern * * * Company was not a consolidation or reorganization of the old company, along with others, then, and in that event, petitioner alleges that the Shreveport * * * Company is in fact merged into the Southwestern * * * Company, and that said company has acquired all of the old company's assets and business and has left the Shreveport * * * Company merely a corporate shell, and that the said Southwestern * * * Company did not assume any liabilities of the Shreveport * * * Company, but bought subject to the mortgage or bonded indebtedness against the Shreveport * * * Company. That the alleged sale or transaction was without any real consideration and was a mere division (diversion) of the corporate property of the Shreveport * * * Company to the said Southwestern * * * Company. That the said Southwestern * * * Company, having taken over all the assets of the Shreveport * * * Company, without any consideration or any transaction in which any real consideration was paid, is liable for all debts and liabilities of the Shreveport * * * Company."

He prays for judgment against the two companies, in solido, or, in the alternative, should the court hold that the said "Southwestern * * * Company is not indebted in solido with the Shreveport * * * Company, then, and in that event, for a judgment against said Southwestern * * * Company * * * and for all further and necessary orders and for general relief."

By supplemental petition plaintiff further prayed for citation of, and judgment (in solido with the other defendants) against, the owners, and J. W. Chamberlain, lessee of the Chamberlain Café property, alleging:

"That the said owners had the said building piped and fitted for the use of gas, and that the said J. W. Chamberlain also equipped the said place of business with gas fixtures, pipes, etc., necessary for cooking and heating in said building. * * * That the said pipes and fixtures were not properly installed, * * * and that they were permitted to deteriorate and become defective, in that natural gas was permitted to escape, and that the said natural gas, * * * added to that escaping from the pipes of the Shreveport * * * Company, caused an explosion on January 2d, that demolished the building, * * * injuring your petitioner, as fully set forth in his original petition. * * * That proper inspection of the said gas pipes and fixtures would have disclosed the defects * * * of the same, whereby natural gas was permitted to escape. * * * That the said owners * * * and the said Chamberlain were * * * each and every one of them guilty of negligence in permitting natural gas to escape * * * and in failing to have the said pipes and fixtures inspected."

The owners and lessee filed pleas of misjoinder and estoppel (based upon the allegations of the original petition), which pleas were sustained, and, as no appeal was taken from that judgment, those parties are eliminated from the case.

The Southwestern Company filed an exception of no cause of action, which was overruled, after which the two companies joined in a general denial, followed by the allegations that the pipes of the Shreveport Company were suitable for the conveyance of gas, were in good condition at the time of the accident, and were properly inspected; that the company had no control of, or responsibility for, the pipes leading into the building in question; and that, if any gas leaked into the basement of said building, it must have come from pipes belonging to, and controlled by, other persons.

We find the following facts established by the testimony, to wit:

Plaintiff was walking on the south side of Texas street, at about 9:30 o'clock on the

morning of January 2, 1912, when, suddenly in front of "Chamberlain's Café, he became unconscious, and, shortly afterwards, found himself, lying, bleeding profusely about the head, upon a bolt of cloth, in a nearby store, whence he was removed to a sanitarium, where his wounds, which had been inflicted by flying glass, were cleansed, sewed, where sewing was required, and dressed, after which he was taken home, where he was confined to his bed, or apartment, for about three weeks, and then, though able to go out, continued, for three weeks more, to have his wounds dressed and bandaged every few days, and, for another six weeks, was hardly in a condition properly to attend to his business." He appears, however, to have sustained no permanent injury or disfigurement. Chamberlain's Café was situated in a much frequented locality, and in a building which had a frontage of 20 feet on Texas street, by a depth not shown. The front, and main, room, in which the patrons were served, appears to have been about 40 feet deep by the width of the building. It had a show window in the eastern side of the front, a counter, set out some 3 or 4 feet from the wall and extending nearly the depth of the room, on the same side, and a door in the front in the western side. The floor was elevated from 18 inches to 2 feet above the ground, and the ground underneath was, and had always been, in bad condition, by reason of water and sewerage which stands there. In the sidewalk, immediately in front of the show window, there was an excavation, say 20x14 inches and 12 inches deep, with a grating over it, which was intended to afford ventilation under the floor. Gas was introduced into the establishment from a cast-iron main pipe laid in the street, through a wrought-iron service pipe which passed underneath the ventilator and the window, and, after entering the premises, was supplied with a "Y" or "T" joint and thus extended in two direc-

tions; the one, to a meter which stood behind the counter at a distance, as we take it, of 6 or 7 feet from the front; and the other, to a meter which stood in the back room (or kitchen, as we shall call it), near the western wall. Our understanding of the situation is expressed by the subjoined diagram, which is made, in part, from a similar diagram, filed in evidence on behalf of plaintiff, and, in part from what we conceive to be the preponderance of the evidence and the surrounding conditions. The diagram which we have prepared differs from that filed by plaintiff in the one particular (save as to minor matters), that it shows but one service pipe entering the premises from the main pipe, whereas the other shows two such pipes. We have made this difference because Chamberlain, who had occupied the premises for years and had had some of the pipes installed, testified positively that there was but one service pipe entering from the main, and we are satisfied that he was in a better position to know than either Gill or Wessell; the first named of whom appears to have visited the premises on the day after the explosion, when all the pipes had been removed, and is not shown to have been there before; and the last named of whom visited the premises some three weeks, or a month, later and had not been there previously, since an occasion, about eighteen months before the explosion, when, he says, that, though not employed by Chamberlain to fix gas pipes, or for any other purposes, as we understand him, he nevertheless went under the floor to mend a sewer, the ground being covered with water and sewerage, being only 18 inches or 2 feet below the floor, lighted only by the ventilator in front, and the place being altogether the most terrible that he was ever in, and there made the observations from which he testified. If, however, there were two pipes, that circumstance would militate to the advantage of plaintiff

as increasing the probability that the escaping gas came from a pipe installed by the company and not by the owner or tenant. We may add, in this connection, that, in preparing the diagram hereto attached, we have given the defendants the benefit of the showing of the other, to the effect that the service pipe extending to the meter in the kitchen was brought through the floor at the point "A" though we can see no reason why it should not have continued under the floor until it reached the meter. Mr. Seip, a witness called by defendants, testified that he examined the pipe leading from the meter, in front, along the east wall, a few minutes after the explosion; that it was upon, and not under, the floor; that it was very thin and covered with rust, which, by the jarring of the floor, might have been shaken off, leaving pits or holes through which the gas could escape. He did not testify that he saw any such pits or holes. He also testified that he saw other pipes, which had been under the floor (the floor at that time having been blown to pieces), and that they, like the pipe that he examined, were in bad condition. He further testified that the explosion was, apparently, "from the front, back, about halfway the building"; that the floor was about 18 inches above the ground; that the ground was covered with water; that the condition was favorable to the deterioration of the pipes; and that the presence of sewerage was likely to hasten such deterioration.

It is beyond question that the explosion occurred beneath the floor, and we find no reason to believe that the pipe which Mr. Seip examined, whatever may have been its condition, contributed thereto, since the tendency of gas, escaping from it, would have been upwards and not downwards through a plank floor.

Mr. Seip, in giving his opinion of the pipes, other than the one examined by him, makes no discrimination in favor of the service pipes; and, as they were subjected to the same deteriorating influences as the house pipes, it is to be presumed that their condition was no better. Moreover, there was a circumstance which creates an unfavorable presumption against the defendants on that point, to wit, while the fire was in progress, the gas company, having no other means of stopping the escape and burning of the gas than to dig down to the pipe beneath the sidewalk, assigned a gang of men to that job under George Moore as foreman, and they not only removed the pipe from under the sidewalk but from the entire premises. After the institution of this suit, Moore was examined, out of court, by consent, as a witness for the defense; but defendants' counsel did not offer the testimony so taken, on the trial, and, when it was offered by counsel for plaintiff, they objected, on the ground that the witness had not been sworn, and the objection was sustained. Plaintiff's counsel then proposed that the testimony be again taken, by consent or by order of the court, at the residence of the witness, who was ill; but defendants' counsel declined to give their consent, and the proposition could not be sustained. Defendants' counsel did not offer any of the removed pipe in evidence, on the trial, nor do they appear to have tendered it to plaintiff; but it is shown that counsel whom Chamberlain had employed to bring a suit in his behalf, and who recovered $3,500 paid by way of compromise, had made a demand for it, and that certain pipe had been returned, concerning which, Chamberlain testified, in effect, that he did not know whether it was the same that had been taken away, that the part which was returned, as service pipe, was rusty and had holes in it which may have been made in digging it up, that it was about four feet long, and that he threw it away. We conclude, taking the evidence and presumptions together, that the holes were caused by rust, that the service

pipes had deteriorated, and were in a leaky condition, and, as plaintiff alleges in his supplemental petition that the house pipes leaked, it follows that the escape of the gas which caused the explosion must be attributed to the bad condition of both service and house pipes.

Upon the question of the ownership of, and responsibility for, the service pipes, and the gas contained in them, some testimony, offered by plaintiff, was admitted, and some excluded (as we think, improperly). W. E. Hamilton testified that he and others bought the "Old Shreveport Gas Company," and, after liquidating it, sold the property to the Shreveport Company (present defendant)· of which he was practically manager, from the beginning, and later, president, and, further, as follows:

"Q. Mr. Hamilton, in selling your stock to the present company—you sold your stock to the present company? A. Yes, sir. Q. I believe that the Daweses controlled that company and bought you out? A. Rufus Dawes bought, individually; then, of course, he and his associates acquired the property. * * * Q. Mr. Hamilton, who owned the service pipe, in your time; that is, the pipe from the main to the meter? A. The company owned the pipe from the main to the meter."

Joshua Gill, at one time manager (under Hamilton) of the Shreveport Company, and afterwards plumbing inspector and gas inspector of the city of Shreveport, and practical plumber, gave the following, with other, testimony:

"Q. When is the consumer charged with gas? * * * A. As measured by the meter. Q. So, after it passes the meter, it is owned by whom? (Objection, that the question, who pays for gas and who owns it, is a matter of personal contract, and that the witness was not a party to such contract, he was incompetent to testify on the subject: which objection was sustained.) * * * Q. Mr. Gill, if gas escapes from a service pipe, that is, from the main to the meter, whose loss is that? (Objected to as irrelevant, and objection sustained.) * * * Q. I will ask you whose duty it was to inspect the service pipe? A. The gas company's."

In the act of conveyance from the Shreveport Company to the Southwestern Company "service pipes" are especially mentioned as among the things conveyed.

Mr. Curtis, manager of the Shreveport Division of the Southwestern Company, was called (as for cross-examination) by plaintiff, and testified at some length. He did not undertake to repudiate the title to the service pipes thus vested in his company.

## Opinion.

[1, 2] In the answer filed by the two defendant companies, it is alleged:

"That the mains and pipes of the Shreveport * * * Company, used to convey natural gas, were suitable and proper for that purpose; that said pipes and mains were in good condition at the time of the alleged accident; that a proper inspection of such pipes and mains was maintained by said company; that said company had no control over, or responsibility for, pipes leading into the building No. 313 Texas street, further than the sidewalk."

The defense thus set up may be otherwise stated as follows: That the Shreveport Company has no control over, or responsibility for, pipes, which it had bought and paid for, which constituted an essential part of its plant which it used for the conveyance and delivery of the gas sold by it; of which it alleges that they were suitable and proper for the conveyance of gas, that "a proper inspection was maintained by said company" (meaning itself), and that they were in good condition at the time of the accident. And, as thus stated, the defense is unintelligible, since the law vests in the owner the control of that which belongs to him and holds him responsible for the manner of its use, and the allegation "that a proper inspection of said pipes and mains was maintained by said company" (said company being the owner of "said pipes and mains") is a recognition of "said company's" control of the pipes and mains, at least for the purposes of inspection, and of its obligation and responsibility with respect to such inspection.

The answer, itself, contains no other interpretation of the excerpt above given than

that which its language imports; but we find in the record an objection interposed by defendants' counsel to certain testimony offered on behalf of plaintiff, which seems to throw some light upon the subject, reading as follows:

"Objected to by counsel for defendants, for the reason that it is not shown that the company has anything to do with the service line inside of the curb of this building.

"Objected to on the further ground that, * * * when they installed natural gas in the city, the city council passed an ordinance, * * * dated October 20, 1908, entitled 'An ordinance governing installation, extension and repair, or alteration, of gas piping in buildings,' etc. This ordinance distinctly makes the dividing line of responsibility and control between the gas company and the consumer at the curb, or one foot inside of the curb. The duty to inspect and look after the piping, inside of the dividing line, or one foot inside of the curb, is fixed upon the consumer, and the ordinance requires that the consumer, on its passage, must, before the piping is installed, and also as to existing piping, make application to the plumbing inspector and have him inspect the pipes, from the curb in, and must pay him for the inspection. The ordinance provides that the gas company is authorized (does not say required) * * * to prevent their own loss, by leaking gas, * * * to put in stop cocks. This ordinance takes the control, from the curb line in, out of the gas company, and places it in the consumer, and makes it the duty of the plumbing inspector to make the inspections, and we have no control over them, and cannot be held responsible for any leakage that occurs between the curb and the building, and therefore any evidence, as to previous explosions which were caused by leakings inside of the line, * * * is irrelevant. * * * "

From our reading of the ordinance in question (which is in evidence), we understand its purposes to be to protect the public from the dangers resulting from the use of gas, by imposing certain obligations upon those who deal in, provide means for the distribution of, or use, that dangerous commodity, and, at the same time, to afford the consumer some means of protection against inefficient service and overcharges by the purveyor. The assumption by defendants that, in passing the ordinance, the city council has attempted to devest the gas company of its property in the manner set forth in the above objection, to deny it even the right of inspection, and to relieve it of all liability for its negligent handling, is unfounded; and, if such an attempt had been made, it could, by no possibility, be sustained. The ordinance reads, in part:

"Be it ordained * * * that all inspection and testing of gas meters, gas piping and installation of all kinds of gas apparatus, shall be under the supervision of the plumbing inspector or his deputy, and that the following rules and regulations shall govern the same, the violation of which rules and regulations shall be unlawful:

"Section 1. Before any work of any kind which is governed by these regulations is commenced, a permit shall be applied for by the person having the work done, and an inspection fee of 50 cents shall be paid by the person to whom the permit is issued, which fee of 50 cents shall cover the cost of all inspection of the work for which the permit is issued, unless hereafter otherwise provided.

"Sec. 2. A shut-off cock, of the same size as service pipe from curb to house, shall be placed not more than one foot inside of the curb line provided with the most approved box to insure immediate control of supply of gas by the fire department, in case of fire, and such box shall have on its cover the word 'gas.'

"Sec. 3. Within twelve months from the passage of this ordinance, all existing service pipes, not having shut-off cocks and boxes, shall be so equipped. Except that, where located on paved streets or alleys, a shut-off cock may be placed at the most convenient place on the premises."

There are many other provisions, intended to carry into effect the main purposes of the ordinance, and, to that end, to impose certain obligations upon all persons undertaking to install gas or deal with its distribution, and, on the other hand, to confer certain rights upon the consumer; but there are none which deny to the purveyor the right to control the delivery of its gas to the purchaser, subject to the rules, thus provided in the interest of the public, and of the public safety. When the gas company undertakes to install a service pipe, it is required to obtain a permit, "to have the work done under the supervision of the plumbing inspector or his deputy," and to place a shut-off cock "not more than one foot inside of the curb line, * * * in order to insure the immediate control of supply of gas by the fire depart-

ment"; but that provision does not deprive it of its control of the service pipe, between the curb and the meter, any more than between the curb and the main. If it did, and could legally be done, the consumer would be at liberty to take the gas from the pipe before it is measured and delivered to him, through the meter, which we know the gas company, and perhaps the law, would regard as in the nature of a theft.

According to the testimony of Mr. Gill, who, as plumbing inspector, drew up the original ordinance, the proviso, beginning with the word "except," in section 3, was inserted, over his protest, at the instance of the gas company; and when Mr. Curtis, the manager of the company, was asked, when on the stand, whether the company had placed a shut-off cock in the pipe in front of Chamberlain's, his reply was: "No, sir; that was in before the passage of the ordinance" —meaning, as we assume, that the street, being paved, was within the exception, and that the shut-off cock at the meter met the requirements of the exception. But he admitted that the company puts in the shut-off cocks, and we have no hesitation in finding that the obligation to put them in, whether at the curb or the meter, rested upon the company, both as a duty and as a matter of interest, and that it had full control of the service pipes, and of the gas conveyed by them, not only for that purpose, but for all the purposes of this case, and is responsible for its negligent exercise of that control, by reason of which the pipes were allowed to become leaky and the gas to escape. We find in the record the following, which concerns the relations between the defendant companies and the liability of the Southwestern Company for the claim here sued on, to wit:

Mr. Hamilton testified that, when he sold the Shreveport Company, "Rufus Dawes bought individually; then, of course, he and his associates acquired the property." The act of conveyance whereby the Shreveport Company sold to the Southwestern Company reads, in part:

"This indenture * * * entered into this 28th day of October, 1912, by and between the Shreveport Gas, Electric Light & Power Company, a corporation duly organized and existing under and by virtue of the laws of the state of Louisiana (hereinafter, for convenience, termed the 'Old Company') and the Southwestern Gas & Electric Company, a corporation duly organized and existing under and by virtue of the laws of the state of Delaware (hereinafter, for convenience, termed the 'New Company'), witnesseth:

"That, for and in consideration of the sum of $1,000 and other good and valuable consideration, the receipt of which is hereby acknowledged, the Old Company has granted, bargained, sold * * * and set over * * * unto the New Company * * * all of the following described real, personal and mixed property, rights, privileges and franchises, to wit:

And then follows an exhaustive enumeration of property, rights, privileges, concessions, etc., and a general clause, reading:

"Each, all and every of the Old Company's assets, rights, privileges, franchises and things of value, of any and every kind, name and nature, real, personal and mixed, legal and equitable, tangible and intangible, corporeal and incorporeal, wheresoever situated and in whatsoever form together with all of the good will acquired by the Old Company in the conduct of its business, it being the intention hereof that the Old Company shall transfer to the New Company each and every species and item of property, rights, franchises, privilege, or thing of value belonging to the Old Company, and that the New Company shall take over and acquire the entire property and business of the Old Company as a going concern."

The instrument was acknowledged on behalf of the Shreveport Company before a notary public of Cook county, Ill., by Rufus C. Dawes, as president, and H. B. Hurd, as assistant secretary, and, in addition to those above quoted, contains a recital to the effect that the property "is conveyed subject to the lien of three mortgages," the dates of which are given, but the amounts of which are not given.

Mr. Curtis testifies that he was the manager of the "Old Company" and has continued as manager of the Shreveport Division

of the New Company"; that practically no changes have been made in the office force; that Henry M. Dawes, a brother of Rufus C. Dawes, is president of the Southwestern, or New, Company; that he believes that the Dawes family are largely interested in the Southwestern Company, and knows that they are largely identified with the "Old Company," at Texarkana, which has passed to the Southwestern Company; that they occupy positions with the Southwestern Company, but he does not know whether they are in control of it; that "we do not have the stock books here."

It has been said that transactions whereby the interests of two or more corporations become identified are susceptible of arrangement into four general groups, and that:

"The first of such groups comprehends consolidations proper, where all the constituent companies cease to exist, and a new one comes into being; the second, cases of merger proper, in which one of the corporate parties ceases to exist, while the other continues. The third group comprehends cases where a new corporation is, either in law or in point of fact, the reincarnation of an old one. To the fourth group belong those transactions whereby a corporation, although continuing to exist de jure, is in fact merged in another, which, by acquiring its assets and business, has left of the other only its corporate shell." Atlantic & B. R. Co. v. Johnson, 127 Ga. 392, 56 S. E. 482, 11 L. R. A. (N. S.) 1119, note.

According to the consensus of judicial opinion in this country, a newly organized corporation is liable for the debts of an old one, to the business and property of which it has succeeded, where it is shown that the succession was the result of a transaction entered into in fraud of the creditors of the old corporation, or that the circumstances attending the creation of the new, and its succession to the business and property of the old, were of such a character as to warrant the finding that the new, is merely a continuation of the old, corporation. The courts are also agreed that there can be no consolidation of corporations, and no merger of one into another, and particularly of a domestic into a foreign corporation, without legislative authority, general or specific, and the consent of all of the shareholders; that the properties of a corporation constitute a trust fund for the payment of its debts; and that, where there has been a misappropriation of such funds, or (according to the better opinion, as we think) the corporation has been devested thereof by consolidation, merger, reorganization, or "reincarnation," not only may the fund be followed, by the aid of equity, for the benefit of the creditor, but he may recover, in an action at law, against the corporation which has taken over such fund, with the business of his debtor.

There is not the same concurrence of opinion upon the question whether, or under what circumstance, the mere absorption by one corporation of the property and business of another operates as a merger of such other corporation, or subjects the property so absorbed to the claims of its creditors, or the absorbing corporation to liability for such claims. In the case of a sale, in good faith, of the property and business of a strictly private corporation, duly authorized by its shareholders, to a third person, for an adequate consideration, the property would no doubt pass free of incumbrance, and the creditors would be relegated to the proceeds in the hands of the debtor corporation; but, where the purchaser is a new corporation, composed of the same shareholders as the old, the transaction, in no manner, affects the rights of the creditors of the old corporation, who may proceed for the recovery of the amounts due them against either corporation, or both; and that, whether the claims be founded in contract or tort, since the real debtor, though represented by two corporations instead of one, remains the same, in contemplation of law. 10 Cyc. 286, 287, 288, 302, 303, 314; Stockton v. Central R. Co., 50 N. J. Eq. 52, 24 Atl. 964, 17 L. R. A. 97; People v. Ballard, 134 N. Y. 269, 32 N.

E. 54, 17 L. R. A. 737; Sharples Co. v. Harding Creamery Co., 78 Neb. 795, 111 N. W. 783, 11 L. R. A. (N. S.) 863; Atlanta & B. R. Co. v. Johnson, 127 Ga. 392, 56 S. E. 482, 11 L. R. A. (N. S.) 1119, and note; Luedecke v. Des Moines Cabinet Co., 140 Iowa, 223, 118 N. W. 456, 32 L. R. A. (N. S.) 616, and note; Chicago, M. & St. P. R. Co. v. Bank, 134 U. S. 276, 10 Sup. Ct. 550, 33 L. Ed. 900; Hancock v. Holbrook, 40 La. Ann. 61, 3 South. 351; Taylor v. Gulf Land Co., 119 La. 434, 44 South. 187; Louisville & N. R. Co. v. Biddell, 112 Ky. 494, 66 S. W. 34.

[3, 4] The evidence to which we have referred, in the foregoing statement of the case, discloses the earmarks of a transaction between persons dealing with themselves, and threw upon them the burden of proving that it was, in fact, a sale, for adequate consideration, between different persons, and not merely part of an arrangement whereby the same persons, owning the stock of several corporations, created under the laws of as many states, have established another corporation, under the laws of still another state, in order to take over and concentrate the control of the entire property. No doubt, the burden usually rests upon the plaintiff to make out his case; but, where a court is called upon to investigate a transaction which is out of the usual course of business, which, upon its face, operates to the prejudice of the creditors of the parties thereto, and all the information concerning which is in the possession of such parties, who are beyond the jurisdiction of the court, a somewhat different rule is applied. And the case here presented is of that character. A corporation created under, and governed by, the laws of Louisiana, and charged with a duty to the public, acquires, in virtue of that status, many rights and privileges and much property, and incurs many obligations, and it suddenly, by an instrument executed in Illinois, makes a conveyance, omnium bonorum

(including not only all of its rights, privileges, and property, but its going business), to a Delaware corporation, which assumes none of its obligations, not even the obligation to continue the business and discharge the duty which it owes to the public; and the recited consideration for the conveyance is "$1,000 and other good and valuable consideration in hand paid." The $1,000 is insufficient to satisfy the judgment in this case, and, if actually paid, amounts to no consideration, and the words "other good and valuable consideration," while no doubt satisfactory, as between the parties to the instrument, require explanation in order to give them value to the creditors, to whom they represent all that is left of property, corporeal and incorporeal, which constituted a "trust fund" a "common pledge," for the payment of their claims; and that explanation should have been given, we think, by the defendants, who alone possess the necessary information; and, as they have failed to give it, they have no reason to complain that we adopt the explanation suggested by the allegations of plaintiff's petition and by such facts as have been disclosed by the evidence.

"When an act of sale is attacked by a creditor of the vendor, as simulated, on the ground that no price was paid" (this court has held), "proof of payment of the price is on the party interested to maintain the sale. The creditor cannot be required to prove a negative." Fisher v. Moore, 12 Rob. 95; King, Adm'r, v. Atkins, 33 La. Ann. 1057; State v. Jahraus, 117 La. 286, 41 South. 575, 116 Am. St. Rep. 208; Hollins v. Railroad Co., 119 La. 418, 44 South. 159.

"If the corporation receiving the transfer" (says a writer on corporation law) "was controlled by the same persons as the company executing it or if the real parties in interest were substantially the same, the burden of showing that the transfer was made in good faith, for value, would fall upon those asserting its validity against unpaid creditors." Morawetz on Private Corporations (2d Ed.) p. 761.

It is evident that, where the question at issue is whether the corporation executing, and the corporation receiving, the transfer, are controlled by the same persons, the same

reasons exist for putting the burden of proof on them, as against an unpaid creditor, as where, the identity of the control being admitted, the question is as to the verity and good faith of the transfer.

Plaintiff claimed $2,000 for loss of business, $2,500 for suffering, $118 for expenses, and $59 in reimbursement of an amount paid by way of damages which he was obliged to pay. The amount for which he obtained judgment was, as we have stated, $2,427. We do not find it excessive, nor are we persuaded that it should be increased. The verdict and judgment appealed from are therefore

Affirmed.