ALLAN HART v. NATHAN MILLER and BRANDYWINE RACEWAY ASSOCIATION, INC., a Delaware corporation, v. JOHN W. KANE and WILMINGTON RACEWAY ASSOCIATION, a Delaware corporation, Third Party Defendants.

(*August* 25, 1955.)

CAREY, J., sitting.

*Stewart Lynch* and *Florence E. Freeman* for plaintiff.

*S. Samuel Arsht* and *John T. Gallagher* (of the firm of Morris, Steel, Nichols and Arsht) for defendants.

Superior Court for New Castle County, No. 272, Civil Action, 1953.

CAREY, J.:

This suit is to recover the reasonable value of services which the plaintiff allegedly rendered the defendant Brandywine Raceway Association, Inc. (herein called Brandywine) and Wilmington Raceway Association (herein called Wilmington) of which Brandywine allegedly received the benefit. The statement of facts herein is believed to represent the most favorable situation from plaintiff's view.

Late in 1949, Hart conceived the idea of erecting and operating a race track in New Castle County. He broached the subject to John W. Kane, who agreed to finance, or help finance, the venture if necessary permits could be secured from the appropriate State and County Agencies. In October, 1950 Wilmington was organized, but no stock was ever issued nor did anyone ever pay any money into its treasury or supply it with tangible assets. The books of Wilmington are not in evidence, and both Kane and Hart, in their testimony, were unable to recall who the officers and directors were. The indications are that Kane was President and Hart Vice-President, and that two other men, Jacobs and Waldman, had some connection with it.

Hart, along with an architect named Colish, examined several possible sites and decided upon a location near Deemer's

Beach. An application was filed with the Delaware Harness Racing Commission for a permit to operate a track there. In a very short time, however, this application was withdrawn because the location was found unsuitable. Later, still in 1950, a desirable site was located in Brandywine Hundred, near Talleyville, and a new application was filed. Before this application was acted upon, the trouble in Korea made it impossible to procure steel for a project like this and, therfore, this application was withdrawn.

Some time in 1952, steel again became available, and Wilmington filed a new application for this location in Brandywine Hundred. Hart at that time had a verbal option for the purchase of the land. There were at least three other applications pending with the Racing Commission on behalf of other parties, but the Commission apparently was reluctant to grant more than one permit for New Castle County. Hart says in his depositions that it was only because of his personal efforts that the members of the Commission were persuaded not to grant a permit to a rival concern. He had a number of talks with members of the Commission, both individually and collectively, as a result of which they looked over the proposed site.

In October, 1952, Kane suggested to Hart that Nathan Miller be brought into the project because it was thought that Miller might have some influence in helping to secure the permit. Hart objected to this proposal and even after a lengthy conversation still did not agree to it. To his surprise, therefore, he learned on October 28 that Brandywine Raceway Association, Inc., had been organized on October 21 with Kane and Miller being parties thereto together with Benjamin F. Shaw and John Hazzard. It was on October 28 that he met Kane and Colish at the proposed site and found that Kane had brought Miller with him. Upon being introduced, Miller asked Hart if he was the man selling the land and Hart replied that he was associated with Kane in promoting the track. During the day Hart talked at length with Miller and told him that he was "in on the deal". The record

does not disclose that Hart explained to Miller precisely what was meant by this statement. In any event, Miller told him to do his "end of the work".

At some stage of his activities prior to October 28, Hart had procured a written option for the purchase of the land in the name of Wilmington. The expiration date of this option was November 1st. On that day, the three gentlemen decided to go ahead with the purchase of the property, having received a commitment from the Racing Commission. Kane and Miller instructed Hart to look after the details of settling for the property. On November 3d, he got the sellers to sign a binding contract in favor of Brandywine, the agreement being executed by Miller and Kane as Vice-President and Treasurer, respectively, of Brandywine.

On November 7, the permit was issued by the Racing Commision. Rumors were afloat to the effect that the area which included the proposed site might be rezoned in the near future and it was accordingly highly important to get a building permit as quickly as possible from the County Building Commission. Miller stated that this was Hart's job and that they were looking to him to do whatever was necessary to obtain the building permit. They authorized Hart to get preliminary plans from Colish to present to the Building Commission and to employ surveyors to run out the land and to make a boundary and topographical map. Hart attended to these details and in due course, obtained a building permit in Brandywine's name.

Affidavits filed herein by Shaw and Hazzard state that they had never heard of Hart until early in January 1953, when they received a letter from Hart's attorney charging a conspiracy on the part of the four to deprive Hart of his interest in the project and requesting a conference for the purpose of having his interest recognized. Hart admits that he never had any personal contact with either Shaw or Hazzard and that he had no dealings with Miller concerning this project prior to October 28.

It appears that Kane wrote the Racing Commission on October 23 as President of Wilmington, withdrawing its application for a permit and at the same time filed an application on behalf of Brandywine. On the same day, the Racing Commission adopted a resolution agreeing to issue Brandywine a permit on or before January 15, 1953, and rejecting all other pending applications for licenses in New Castle County. Hart did not learn of these events until after Brandywine's application had been granted.

Hart's affidavit states that he and Kane agreed, at the very inception of Wilmington's existence, that when the proposed track came into being, Hart was to be "part of the deal". He explains this language to mean that he was to have a position in connection with the track, was to be reasonably compensated for his services toward obtaining the race track objective, and was to have a capital interest in the track on the percentage basis of twenty percent of whatever should be Kane's capital interest in the corporation. The affidavit summarizes his efforts towards securing the objective. It further states that he was told, upon learning of the new corporate set-up, by both Kane and Miller that he was to continue with Brandywine in the same position and status as he had been working with Wilmington; and further that he was told by both Miller and Kane that the former was the man in charge of the Brandywine; and that, at their request, he proceeded to procure the agreements of sale for the land, secured the necessary survey, and applied for and obtained the building permit. After doing all these things, he was told that his services were no longer required and he has paid nothing for his efforts.

Although counsel have not stressed the distinction, it is, in my opinion, necessary to differentiate between Hart's services prior to October 28, 1952 and those after that date. The record contains testimony which, if proven to the jury's satisfaction, might well justify a finding of liability against Brandywine or Miller for the reasonable value of Hart's work after that

date. A jury could find that he performed those functions for Brandywine at the request of Miller and/or Kane, that Brandywine received the benefit of them, and that Brandywine is liable either under the theory of implied authority or the doctrine of ratification. On the other hand, still speaking of the services rendered after October 28, even if Brandywine should not be liable, it might be possible that Miller is responsible by reason of misrepresentations of his authority as agent. Those are questions for the trier of facts and for this reason defendant's motions for summary judgment must be denied.

Notwithstanding this conclusion it is appropriate under *Superior Court Rules*, Civil Rule 56, *Del. C. Ann.*, to give consideration to the rest of Hart's claim in order to determine what disposition should be made of that part of the case. To do so, we must analyze the contentions advanced in plaintiff's brief.

It is argued that Kane and Hart agreed in the very beginning that the latter was to receive compensation for his services as a promoter, if and when the project became an accomplished fact; that it was in both of their minds that such remuneration would come from Wilmington; that Wilmington at the time was simply the corporate alter ego of Hart and Kane, and this agreement was in fact that of Wilmington. Moreover, it is contended that, even if it was not actually Wilmington's contract, nevertheless the services prior to October 28 were performed for Wilmington's benefit and it would be liable on an implied contract. It is next argued that Brandywine was in fact simply the continuation of Wilmington, that is, that there was in legal effect a merger of Wilmington into Brandywine. It is then concluded that Brandywine became liable as the merging corporation for Wilmington's obligation to the plaintiff. This theory of merger is based upon the charge that Brandywine took over all of Wilmington's assets and received all the advantages of the preliminary work done by Hart and Kane on Wilmington's behalf. To support the proposition, the brief cites the cases of *Drug, Inc., v. Hunt*, 5 *W. W. Harr.* 339, 168 *A.* 87, and *Wolff v.*

*Shreveport Gas, Electric Light & Power Co.,* 138 *La.* 743, 70 *So.* 789, *L. R. A.* 1916D, 1138.

We may pass over the question of Wilmington's liability to Hart because, even if it be conceded, the facts of this case do not justify the holding, either as a legal or factual matter, that there was a *de facto* merger. This would be essential to plaintiff's case against Brandywine, for it is the only theory of liability advanced by him. He is in a Court of law, not equity, and we are not concerned with any question of an equitable lien upon assets taken over by Brandywine without consideration or with any other theory mentioned in the *Hunt* case, *supra,* which a Court of equity might consider.

The cases cited by plaintiff involved factual situations very different from that presented here, as a brief statement will show. In *Drug, Inc., v. Hunt, supra,* a written contract was made between two corporations whereby one took over all the assets of the other and assumed all its debts and liabilities. The consideration was the issuance of new stock in the buyer to the stockholders of the seller. This contract was adopted by both Boards of Directors and was approved by the Stockholders. Although the contract was in form an agreement of sale, our Supreme Court held that there was a *de facto* merger, and that a tort creditor of the "selling" corporation could proceed in law directly against the "buying" corporation.

In *Wolff v. Shreveport Gas, Electric Light & Power Co., supra,* the owners of a corporation caused a new one to be formed in another state and transferred all assets of the old one to the new one, which simply continued to carry on the old business. The facts were such as to cause the Court to hold that the new corporation was simply a continuation of the old one and that the burden of disproving this inference was upon the defendant. No such proof having been offered, the Court sustained a verdict against the new company in favor of a tort creditor of the old one.

It is clear that the transfer of the assets of one corporation to another does not, of itself, create a merger. *Fidanque v. American Maracaibo Co.*, Del. Ch., 92 *A*. 2d 311. Under the view most favorable to plaintiff's case, nothing more occurred here than a transfer of Wilmington's assets to Brandywine without consideration. These assets consisted of the option on the land and some preliminary plans or sketches in the files of the Racing Commission. While, assuming those assets had value, Brandywine might be accountable for their value to Wilmington or Wilmington's creditors in a proper action, the record is insufficient to justify a finding of *de facto* merger and a consequent liability upon Brandywine for all debts of Wilmington, known or unknown. More is required. *Cf. Blackstone v. Chandler*, 15 *Del. Ch.* 1, 130 *A*. 34. I conclude that the plaintiff has disclosed no cause of action against Brandywine for services prior to October 28, 1952.

With reference to the possible liability of Miller personally for plaintiff's services prior to October 28, although the letter written by his attorney in the following January charged a conspiracy, no such theory is now advanced as the basis of charging him. The only argument now made in this connection is that he joined the promotion venture which had existed between plaintiff and Kane and thereby became personally liable on the agreement under which the promotion was arranged, that is, that Hart would be paid for his services. Of course, the mere act of becoming a co-promoter, if that be what he did, did not of itself make Miller personally liable to Hart. 1 *Fletcher on Corporations* 606. To be bound, he would have had to so agree after knowing the facts. There is no evidence in the present record to show that he expressly agreed to be personally bound. Miller himself flatly denies accepting or adopting any agreement that may have previously existed between plaintiff and Kane; he further denies that it came to his attention. He states that he once asked Kane about Hart's status and was told that he need not worry about Hart, that the latter was simply Kane's errand boy or office boy. In Kane's deposition,

he was not asked whether he and Miller had had any conversation about Hart or whether Miller's version was correct. The only evidence in the record which could possibly be seized upon to show knowledge on Miller's part is plaintiff's own statement that he told Miller that he was "part of the deal". Surely this is insufficient to charge Miller with knowledge of the terms of the alleged agreement between Hart and Kane, or to impose personal liability upon Miller for it. As the record now stands, there is no justification for holding Miller personally liable under the only theory advanced by plaintiff.

■ While a plaintiff, in resisting a motion for summary judgment, is not necessarily required to bring into the record all of the evidence available, nevertheless when the moving party brings in evidence which, if uncontradicted, warrants summary judgment in his favor, the duty is cast upon the other party to disclose enough evidence to demonstrate the existence of a genuine issue of fact for submission to the jury. *Frank C. Sparks Co. v. Huber Baking Co.*, 9 *Terry* 9, 96 *A.* 2d 456. The plaintiff in this case had full opportunity to take Miller's deposition and did not do so. Depositions of Kane and Hart were taken and, as indicated above, include no testimony sufficient to charge Miller. We may, therefore, assume that the evidence does not exist.

We are not concerned with any possible liability to Hart on the part of Kane or Wilmington, since, although they have been made parties by the original defendants; Hart has filed no complaint against them. For the reasons set forth herein, the motions of both defendants will be granted as to that part of plaintiff's claim which covers services rendered prior to October 28, 1952, and will be denied as to that part of the claim which concerns services rendered after that date.