52 So.3d 240 (2010)
Jeanette Garnett PICHON, Roland L. Pichon, Mark P. Pichon, Patrice Pichon Robinson, Tracy Pichon Baham, Veronica Pichon Joseph, and Cade Pichon Hagger
v.
ASBESTOS DEFENDANTS, et al.; Bayer Cropscience, Inc. (as Successor of Liaibility to Rhone-Poulenc AG Company f/k/a Amchem Products, Inc., f/k/a Benjamin Foster Company), Seville, Inc. formerly, Branton Insulations, Inc.; Continental Insurance Company; et al.
No. 2010-CA-0570.
Court of Appeal of Louisiana, Fourth Circuit.
November 17, 2010.
*241 Gerolyn P. Roussel, Perry J. Roussel, Jr., Jonathan B. Clement, Lauren R. Clement, Roussel & Clement LaPlace, LA, for Plaintiffs/Appellants.
Lee B. Ziffer, Deborah Kuchler, Monique Weiner, Janika Polk, Jonique Martin Hall, Kuchler Polk Schell Weiner & Richeson, LLC, New Orleans, LA, for Defendant/Appellee Detroit Diesel Corporation.
(Court composed of Judge PATRICIA RIVET MURRAY, Judge MICHAEL E. KIRBY, Judge ROLAND L. BELSOME).
PATRICIA RIVET MURRAY, Judge.
The plaintiffs appeal the trial court's granting of summary judgment in favor of defendant Detroit Diesel Corporation ["DDC"] and the dismissal with prejudice of all claims against said defendant. For the reasons that follow, we affirm.

FACTS AND PROCEEDINGS BELOW
On November 21, 2007, the plaintiffs, the surviving spouse and children of Leon Roland Pichon, filed a petition against numerous defendants, including DDC, as the alleged manufacturers, distributors and/or sellers of various asbestos-containing products to which Mr. Pichon had been exposed during his employment by Halter Marine from approximately 1955 through 2004. The plaintiffs alleged that as a result of his exposure, Mr. Pichon contracted lung cancer and mesothelioma, which was first diagnosed in September, 2006, and which caused Mr. Pichon's death on November 25, 2006.
On November 2, 2009, DDC filed a motion for summary judgment seeking the dismissal of plaintiffs' claims against it on the grounds that it could not have any liability for damages caused by Mr. Pichon's exposure to asbestos prior to 1988, the year DDC first came into existence, nor could it have any liability for his exposure after that time because DDC has never manufactured any products containing asbestos. On December 4, 2009, the trial court denied DDC's motion for summary judgment because DDC had not yet responded to the plaintiffs' requests for discovery; the court also ordered DDC to so respond. Five days after the denial of its motion, DDC submitted its responses to the plaintiffs' discovery requests and filed a motion for new trial from the trial court's denial of summary judgment. The trial court granted the motion for new trial. On January 4, 2010, the trial court again heard DDC's motion for summary judgment. At the conclusion of that hearing, the trial court granted the motion for summary judgment. A written judgment granting the motion was signed January *242 19, 2010. From this judgment, the plaintiffs appeal.

ISSUES
There are two issues on appeal:
(1) Did the trial court err by determining that DDC legally cannot be held responsible under the theory of successor liability for any damages resulting from Mr. Pichon's pre-1988 exposure to asbestos-containing products manufactured and/or sold by General Motors ["GM"]?
(2) Did the trial court err by determining there is no genuine issue of fact that, from the time DDC was incorporated on January 1, 1988, Mr. Pichon was not exposed to any asbestos-containing products manufactured or sold by DDC?

STANDARD OF REVIEW
We note that, although the first issue presents primarily a legal question and the second issue is factual, the appellate standard of review is the same when this court considers the trial court's granting of summary judgment.
Appellate courts review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. Schroeder v. Board of Sup'rs of Louisiana State University, 591 So.2d 342, 345 (La.1991). Thus, the appellate court must determine whether the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact, and that the mover is entitled to judgment as a matter of law. Id. According to La.Code Civ. Pro. art. 966 A(2), the summary judgment procedure is favored and is designed to secure the just, speedy and inexpensive determination of an action. The article further states:
The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.
La.Code Civ. Pro. Art. 966 C(2)

DISCUSSION

I. Successor Liability (Pre-1988 Exposure)

Because DDC did not come into existence until 1988, it cannot be held liable for any damages resulting from Mr. Pichon's pre-1988 exposure except by application of the legal theory of successor liability. The plaintiffs argue that, pursuant to this theory, liability can be imposed upon DDC as the successor to a former division of GM.
The following facts are pertinent to the issue of successor liability. In 1938, GM created its Detroit Diesel Division, an unincorporated manufacturing arm of GM. This division manufactured Detroit Diesel branded engines. In 1970, GM merged this division with another division of the company, the Allison Division, to form the Detroit Diesel-Allison Division. This division continued to manufacture Detroit Diesel branded marine engines. Plaintiffs allege these marine engines, used at Halter Marine, were a source of Mr. Pichon's *243 exposure to asbestos. On January 1, 1988, DDC was formed as a joint venture between GM and the Penske Corporation. DDC purchased the assets of a portion of GM's Detroit Diesel-Allison Division (the portion that had manufactured marine engines).[1] The written Sales Agreement between the parties stipulated:
[DDC] shall not assume or become liable for and GM shall indemnify and hold [DDC] harmless against any liabilities, obligations or commitments of GM or of any of its Affiliates, whether contingent or otherwise, fixed or absolute, known or unknown, present or future or otherwise, relating, directly or indirectly, to (i) the conduct of GM Operations or the ownership of the Assets prior to the Closing, including, without limitation ... product liability claims, litigation ..., (ii) claims relating, directly or indirectly, to products manufactured, distributed or sold by GM prior to the Closing.
Louisiana Civil Code article 1821 provides that one person's assumption of the obligation of another must be in writing to be enforceable against third parties. The Code further provides that a person who assumes, by agreement, the obligation of another "is bound only to the extent of his assumption" La. C.C. art. 1822. Applying this law to the above-quoted language of the Sales Agreement, it is undisputable that DDC did not assume any of the liabilities or obligations of GM when DDC purchased certain assets of the Detroit Diesel Allison Division in 1988.
Nevertheless, the plaintiffs contend that DDC legally may be found liable for Mr. Pichon's pre-1988 exposure to Detroit Diesel engines by application of the theory of successor liability. We disagree.
The basic principle of corporate successor liability was set forth by the U.S. Supreme Court in Golden State Bottling Co. v. National Labor Relations Board:
[T]he general rule of corporate liability is that, when a corporation sells all of its assets to another, the latter is not responsible for the seller's debts or liabilities, except where (1) the purchaser expressly or impliedly agrees to assume the obligations; (2) the purchaser is merely a continuation of the selling corporation; or (3) the transaction is entered into to escape liability. See 15 W. Fletcher, Cyclopedia Corporations ss 7122-7123 (1961 rev. ed.); Kloberdanz v. Joy Mfg. Co., 288 F.Supp. 817 (D.Colo.1968).

414 U.S. 168, 182 n. 5; 94 S.Ct. 414, 424, 38 L.Ed.2d 388 (1973).
As stated above, the first exception does not apply in this instance because DDC clearly did not assume any obligations or liabilities of GM, as is reflected by the Sales Agreement. Nevertheless, the plaintiffs argue on appeal, as they did in response to DDC's motion for summary judgment in the trial court, that exception # 2 applies here because DDC is "merely a continuation" of GM's former Detroit Diesel-Allison Division. We find, however, that the plaintiffs failed to submit factual support sufficient to establish that they would be able to satisfy their evidentiary burden at trial on the issue of successor liability. See La. C.C.P. art. 966 C(2).
First, the written agreement whereby DDC expressly declines to assume any obligations or liabilities of GM presents a *244 hurdle that must be overcome if successor liability is to be imposed In the absence of a transaction entered into for the sole purpose of escaping liability, which is covered by exception # 3 above,[2] we believe the facts showing one corporation to be merely a continuation of the other would have to be especially compelling to impose liability upon a corporation that has expressly contracted out of such liability. In the instant case, however, we do not reach that issue because the plaintiffs have not established sufficient factual support to show that DDC is "merely a continuation" of either GM or of GM's former Detroit Diesel-Allison Division.
A threshold requirement to trigger a determination of whether successor liability is applicable under the "continuation" exception is that one corporation must have purchased "all" the assets of another. Golden State Bottling Co., supra. See also, e.g.: Wolff v. Shreveport Gas, Electric Light & Power Co., 138 La. 743, 70 So. 789 (1916); National Sur. Corp. v. Pope Park, Inc., 240 La. 63, 121 So.2d 240 (1960). Obviously, in the instant case DDC did not purchase all the assets of GM. Nevertheless, plaintiffs contend DDC is the successor of GM's former Detroit Diesel-Allison Division. Although plaintiffs have not cited a single Louisiana case in which one corporation has been found to be the successor of a former division or part of another corporation, they rely upon the following language in dicta from Bourque v. Lemann Lathe, Inc., for the proposition that the two parties involved need not be corporations, but only "business entities":
[T]his rationale for liability [the "continuation" exception noted in Golden State Bottling Co.] would include some non-merger sales in which one corporation or other business entity sells all its assets to another legal entity.

476 So.2d 1125, 1127 (La.App. 3 Cir. 1985) (emphasis added).
Nevertheless, the plaintiffs' argument ignores the holding in Bourque, which was that the Third Circuit refused to impose successor liability upon a corporation that had only purchased some of the assets of the predecessor corporation at a bankruptcy sale but had continued to manufacture essentially the same product as the bankrupt corporation. Id. at 1129.
Pretermitting the issue of whether successor liability can be applied when the predecessor is not a corporation but only a division of one, we conclude that the plaintiffs' argument fails because they have not shown that DDC purchased all the assets of the Detroit Diesel-Allison Division. DDC submitted the affidavit of David Merrion as proof of that some of the assets of that division were excluded from the sale.[3] In response, the plaintiffs have cited only the language of the Sales Agreement, which states that "GM shall ... sell, transfer, assign convey and deliver to [DDC]... all the assets and properties ... relating to the Redford Operations...." This language clearly does not refute DDC's claim that less than all the assets of the division were sold, but rather confirms that only those assets related to the Redford Operations (the location where the marine engines were manufactured) were transferred to DDC.
The court in Bourque, supra, recognized that jurisdictions other than Louisiana have taken a more liberal approach to imposing successor liability in products liability *245 cases such as the instant one.[4] However, the rationale for a more liberal imposition of successor liability is not present in the instant case. In Bourque, supra, the court explained that when a person is injured by a defective product years after that product has been manufactured and placed into commerce by the selling corporation, the rationale for imposing successor liability is that the disappearance of the selling corporation before the injury occurs leaves the injured party with no one to sue and therefore with no remedy. Id., 476 So.2d at 1128. In the instant case, however, GM was clearly a viable defendant at the time the instant suit was filed and is, in fact, a named defendant herein.[5]
As we therefore find no basis in Louisiana law for extending the theory of successor liability to impose liability upon DDC under these particular facts, we conclude that the trial court properly granted summary judgment with respect to this issue.

II. Direct Liability (Exposure from 1988 forward)

The law requires us to consider the evidence put forth by both parties to determine whether there is a genuine issue of fact as to Mr. Pichon's exposure to asbestos-containing products manufactured or sold by DDC from its inception in 1988 through the end of Mr. Pichon's employment at Halter Marine.
DDC asserted in its motion for summary judgment that it has never manufactured or sold any asbestos-containing products. In support of this assertion, DDC submitted the deposition testimony of David Merrion, a former employee of GM and the corporate representative of DDC, who stated that GM began to phase out the use of asbestos in its Detroit Diesel engines in 1980 and had completely phased it out by 1987. In an attempt to refute this testimony, the plaintiffs have submitted a copy of a 1986 GM gasket specification sheet that calls for the use of asbestos on the gaskets of Detroit Diesel engines. In the trial court, plaintiffs argued that the failure of DDC to provide documentary evidence showing that the 1986 specifications had been subsequently modified indicated that asbestos had not been completely phased out and therefore was still being used in 1988. DDC countered that it had properly responded to the plaintiffs' discovery, which had not resulted in the production of any evidence indicating the use of asbestos in DDC's products.
We cannot accept the plaintiffs' argument that a 1986 gasket specification sheet is sufficient factual support to rebut DDC's assertion that it never used asbestos supported by Mr. Merrion's unrefuted testimony that asbestos use in the gaskets of Detroit Diesel engines had been discontinued by 1987. Nor can we accept that DDC's failure to produce a subsequently-dated gasket specification sheet, in the absence of a specific request to do so, is sufficient to raise a genuine issue of fact in this respect.
In its motion, DDC also asserted that the plaintiffs could not prove that Mr. Pichon was ever exposed to any asbestos-containing product manufactured by DDC. In an attempt to refute this assertion, the plaintiffs submitted the deposition testimony of four individuals: Donald Varnado, *246 David Merrion, Louis Frierson, and Jessie Robertson.
Donald Varnado, a co-worker of Mr. Pichon at Halter Marine, stated that asbestos blankets were used on the engines at Halter Marine, and that Mr. Pichon handled asbestos half-round insulation during his career at Halter Marine. However, Mr. Varnado was not able to connect these asbestos products to DDC. In fact, he stated that the asbestos blankets were made and delivered to Halter Marine by Reilly-Benton, a co-defendant in the instant case. Nor did Mr. Varnado ever suggest that the half-round insulation was manufactured by or in any way connected to DDC. Finally, Mr. Varnado testified that he probably left Halter Marine "around '87", which indicates that his testimony cannot have any relevance to Mr. Pichon's exposure to products made by DDC in 1988 and thereafter.
The plaintiffs also cite Mr. Merrion's testimony concerning the specially-made asbestos blankets used with Detroit Diesel branded engines. However, this testimony was in response to a question concerning the time period from 1945 to 1978, and is therefore not probative on the issue of Mr. Pichon's exposure from 1988 forward.
Similarly, the part of Mr. Frierson's testimony cited by the plaintiffs involves asbestos blankets made by George Engine Company, not DDC. George Engine Company, which was a distributor of GM's Detroit Diesel engines, went out of business in 1987 prior to the creation of DDC.
Finally, plaintiffs cite certain testimony of Mr. Robertson, a co-worker of Mr. Pichon at Halter Marine from 1968 to 1982 and from 1987 forward. Again, our review of Mr. Robertson's testimony reveals no reference to any post-1987 exposure of Mr. Pichon to asbestos-containing products made by DDC.
In summary, we conclude, as did the trial court, that the plaintiffs failed to meet their burden of providing factual support sufficient to rebut DDC's evidence that it never manufactured or sold any asbestos-containing product to which Mr. Pichon could have been exposed. We therefore conclude no genuine issue of fact exists regarding Mr. Pichon's non-exposure to any asbestos-containing products attributable to DDC. The trial court properly granted summary judgment on this issue.

CONCLUSION
Accordingly, for the reasons stated, we find that the trial court properly granted summary judgment dismissing the plaintiffs' claims against DDC. We therefore affirm that judgment.
AFFIRMED.
BELSOME, J., dissents with reasons.
I dissent.
In our de novo review of the trail court's grant of summary judgment in favor of DDC, we are limited to determining whether the plaintiffs have established a genuine issue of material fact, regarding DDC's successor liability as to pre-1988 asbestos exposure and direct liability as to post-1988 asbestos exposure, sufficient to overcome summary judgment. A review of the record indicates that the plaintiffs have met this burden.
The issue of successor liability directs us to the applicability of the "mere continuation rule." The "mere continuation rule" is a rule of successor corporation liability whereby liability is generally imposed when an acquiring corporation is a mere continuation of the selling corporation. Bourque v. Lehmann Lathe, Inc., 476 So.2d 1125, 1127 (La.App. 3 Cir.1985), citing Golden State Bottling Co. v. NLRB, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973). Here the plaintiffs have asserted *247 that DDC is clearly a continuation of GM's Detroit Diesel-Allison Division.
The Hollowell court offered three instances in which a new corporation can be a successor corporation for liability purposes:
(1) The new company expressly assumed the liabilities of the old company; or (2) The formation of the new company was entered into to defraud the creditors of the old company; or (3) The circumstances attending the creation of the new company and its succession to the business and property of the old company are such that the new company was merely a continuation of the old company.
Hollowell v. Orleans Regional Hospital LLC, et al, 217 F.3d 379 (5th Cir.2000). The mere continuation doctrine premises liability on whether and to what extent there is a "continued de facto existence of the seller." Bourque v. Lehmann Lathe, Inc., 476 So.2d 1125, 1128 (La.App. 3 Cir. 1985). The determination of whether a new corporation is simply a continuation of the old corporation is fact intensive.
In Hollowell. the court provided eight factors to apply in making the mere continuation determination:
(1) retention of the same employees;
(2) retention of the same supervisory personnel;
(3) retention of the same production facility in the same physical location;
(4) production of the same product;
(5) retention of the same name;
(6) continuity of assets;
(7) continuity of general business operations; and
(8) whether the successor holds itself out as the continuation of the previous enterprise.
Hollowell, 217 F.3d 379.
The majority of the elements mentioned above are addressed within the sales agreement between GM and DDC, and the affidavit of DDC's corporate representative, Dave Merrion. Those documents indicate that Detroit Diesel-Allison Division manufactured Detroit Diesel branded engines. On January 1, 1988, Detroit Diesel Corporation (DDC) was formed as a partnership between GM and Penske Corporation. DDC proceeded to purchase the assets of GM's Detroit Diesel-Allison Division.
The sales agreement specifically required DDC to offer employment to approximately 2700 salaried and hourly employees and provide them with benefit programs comparable to those previously offered by GM. When addressing the facility location and assets to be transferred, the agreement reads:
The purpose of this Agreement is to set forth the conditions of transfer of the business and assets currently carried on by General Motors Corporation ... through its Detroit Diesel Allison Division... at its manufacturing facilities at Redford Township and adjoining Detroit, Michigan ... to Detroit Diesel Corporation or its successors or assigns, including, but not limited to, the business of development, manufacture, assembly and sale of diesel engines.
* * * *
GM shall ... sell, transfer, assign, convey and deliver to DD and DD shall purchase, accept and acquire from GM or any Affiliate as hereinafter provided all the assets and properties ... relating to the Redford Operations ...
Essentially, the product, the Detroit Diesel name, the production location, the employees and the overall general business operations remained the same. Clearly the inquiries into the relevant factors support plaintiffs' assertion that DDC is a mere *248 continuation of GM's Detroit Diesel-Allison Division. The plaintiffs have more than met their burden to overcome summary judgment and allow the question of successor liability to be submitted to the jury.
However, the majority opinion, citing to Golden State Bottling Co., contends that the one fatal issue that prevents the plaintiffs from being able to assert successor liability under the continuation exception, is that the continuation exception mandates that one corporation purchase all the assets of another. The majority's opinion claims that based on David Marrion's affidavit, GM retained certain assets pertaining to specific engines and therefore, the plaintiffs cannot overcome that hurdle. Significantly, the sales agreement does not reference the retention of those assets in its "Excluded Assets" provision. That alone, creates a genuine issue of material fact as to whether all GM owned assets relating to the Detroit Diesel-Allison Division were purchased by DDC. Thus, DDC is not entitled to judgment as a matter of law. La. C.C.P. art. 966(B); Ocean Energy, Inc. v. Plaquemines Parish Government, 04-0066, p. 5 (La.7/6/04), 880 So.2d 1, 5. Considering the record, we are required to allow the issue of successor liability to be presented to the fact finder.
Additionally, based solely on David Marrion's affidavit statement, the lower court and majority's opinion found that DDC, from its inception in 1988, never sold or manufactured asbestos-containing products. Although I do not find that the plaintiffs have proven otherwise, as late as 1986, the specification sheet for DDC's diesel engines still identified asbestos containing materials. The record is void of any later specification evidencing all asbestos containing materials had been phased out of the diesel engines. At a minimum, this raises a question of fact sufficient to warrant additional discovery. Accordingly, I would reverse the trial court's grant of summary judgment in favor of Detroit Diesel Corporation and remand.
NOTES
[1] The affidavit of David Merrion, former employee of GM who became a senior vice-president of DDC in 1988, states that upon the creation of DDC, Penske, which at that time owned 60% of DDC, purchased from GM all the assets of the Detroit Diesel-Allison Division "except for the assets related to Allison transmissions and the 6.2 liter and 8.2 liter engines used in General Motors' truck products."
[2] No such allegation has been made in the instant case.
[3] See footnote 1, supra.
[4] Louisiana has not adopted the more liberal "continued product line" theory of successor liability that has been used in products liability cases in California. See Bourque v. Lehmann Lathe, Inc., supra, 476 So.2d at 1127-1129.
[5] The fact that GM subsequently filed for bankruptcy (but has not been dissolved) is irrelevant to the determination of the legal question presented here.