STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2019 CA 0357

KAREN SUE GILES

VERSUS

OAK LANE MEMORIAL PARK, LLC &
NATIONAL INFORMATION SERVICES, INC.; ET AL

*Judgment Rendered:* NOV 1 5 2019

* * * * * * * *

Appealed from the
23rd Judicial District Court
In and for the Parish of Ascension
State of Louisiana
Case No. 111,255

The Honorable Jessie M. LeBlanc, Judge Presiding

* * * * * * * *

Jill L. Craft                                    Counsel for Defendant/Appellant
W. Brett Conrad, Jr.                             National Information Services, Inc.
Baton Rouge, Louisiana


Robert Ryland Percy, III                         Counsel for Plaintiff/Appellee
Anna Quintero Skias                              Karen Sue Giles
Gonzales, Louisiana



* * * * * * * *


Chutz, J. Concurs

BEFORE: McDONALD, THERIOT, AND CHUTZ, JJ.

McDonald, J. concurs.

**THERIOT, J.**

In this case involving a contract dispute over the purchase of a family burial garden, a defendant appeals a trial court judgment in favor of the plaintiff, ordering rescission of the contracts and return of the purchase price and awarding damages. For the reasons set forth herein, we amend the judgment and affirm as amended.

## FACTS AND PROCEDURAL HISTORY

Oak Lane Memorial Park, LLC ("OLMP") formerly owned and operated a perpetual care cemetery[1] on approximately 32.21 acres in Ascension Parish, Louisiana. A large portion of the OLMP property was subject to a multiple indebtedness mortgage in favor of United Community Bancshares, Inc. ("UCB"). This mortgaged portion of the property was not developed for cemetery purposes, but from time to time, OLMP obtained partial releases of the mortgage from UCB in order to develop additional parts of the property for cemetery use.[2]

In 2010 and 2011, Bobby and Karen Sue Giles contracted with OLMP for the purchase of a family burial plot known as the Giles Family Burial Garden. According to Mrs. Giles, the Giles Family Burial Garden was built because her husband loved the setting of the OLMP property and "wanted to build something special for him and I, his parents, and our kids and grandkids."

OLMP Manager/Member George Bonfanti testified that the land intended for the Giles Family Burial Garden was subject to the UCB mortgage and had not yet been developed for cemetery purposes. For this reason, when Mr. and Mrs. Giles signed the purchase agreements for the Giles Family Burial Garden, OLMP

---

[1] A "perpetual care cemetery" is a cemetery wherein lots and other interment spaces are sold or transferred under the representation that the cemetery will receive perpetual care through a trust fund required by law to be created for that purpose. La. R.S. 8:1(34) and 8:454.

[2] Prior to the first sale of a cemetery space or interment rights in any cemetery space on undeveloped land, a cemetery authority must submit an application to the Louisiana Cemetery Board, along with an application fee; a copy of the preliminary plans; a map or plat delineating the sections, blocks, plots, or other subdivisions with descriptive names or numbers; a copy of all sales promotion material; and a copy of the pre-construction sales contract. La. R.S. 8:705.1. Sale of a space or interment rights on undeveloped land is a violation of the law, punishable by a fine or imprisonment, or both. See La. R.S. 8:704.

2

actually temporarily assigned them a number of burial plots in other developed parts of the cemetery, which were then swapped for the Giles Family Burial Garden once OLMP secured a release of the mortgage on that property[3] and the property had been developed and approved by the Cemetery Board. Mr. Bonfanti testified that as far as he knew, this process would have been explained to Mr. and Mrs. Giles, but he was not a part of the negotiations for the sales with the Gileses and had no firsthand knowledge of what they were told.

The Gileses executed a number of contracts regarding the Giles Family Burial Garden. On June 9, 2010, the Gileses executed OLMP Purchase Agreement No. 1261 for the purchase of 36 "Developed" Adult Spaces, plus certain materials and construction work. The purchase agreement stated that the specific plots purchased were located in the "Garden of Mount Hope" and referenced an attached addendum. The attached addendum cross-referenced agreement No. 1261 and listed each plot purchased. The total cost of this purchase, including construction materials and labor and the 10% perpetual care fee, was $80,270.00. The Gileses also executed a separate OLMP document on June 9, 2010, which stated that "Bobby & Karen Sue Giles has [sic] the right to change to the Lake Garden when those spaces become available. This change will be made at no additional charge."

Subsequently, on April 20, 2011, Mr. and Mrs. Giles executed OLMP Purchase Agreement No. 1571 for 54 "Developed" Adult Spaces. The total cost of this purchase, including the perpetual care fee, was $59,400.00. Agreement No. 1571 identified the selected plots as "Mount Hope (To Be Traded – To Giles Family Garden)," and attached to the purchase agreement was a document[4] that stated:

---

[3] OLMP obtained a partial release of mortgage from UCB, releasing the mortgage on the property for the Giles Family Burial Garden, for $11,000.00 on October 6, 2011.

[4] Although this attachment was signed by the Gileses and a representative of OLMP, it was not dated and did not reference Purchase Agreement No. 1571, to which it was attached; rather, it referenced Special Project No. 1048, which is not contained in the record.

3

> Listed below is the description of burial spaces purchased by the Giles family. These spaces are to be traded for the equal amount of spaces[5] in the newly developed <u>Giles Family Burial Garden</u>. These burial spaces are currently located in the <u>Garden of Mount Hope</u>.

Following a listing of various spaces, the document stated:

> These spaces are to be traded for the equal amount of burial spaces in the <u>Giles Family Burial Garden</u>.

> This Garden will be 40" [sic] (feet) wide at the top and the bottom and 70' (seventy) long on each side. This linear foot measurement is equal to the 84 burial spaces.

On June 22, 2011, Mr. Giles executed Purchase Agreement No. 1573 for 28 "Developed" Adult Spaces. The cost of these 28 spaces, including the perpetual care fee, totaled $23,100.00. This contract did not identify the property selected, either in the contract itself or in an addendum. On that same date, Mr. Giles also executed Purchase Agreement No. 1049 for additional construction materials, for a total price of $5,600.00.

Construction of the Giles Family Burial Garden was completed in accordance with the contracts, and Mr. Giles was buried in the Giles Family Burial Garden following his death in March 2013. Shortly after Mr. Giles's death, Mrs. Giles approached OLMP about constructing a second family burial garden (referred to herein as the "Giles Addition"), to be located behind and contiguous to the existing Giles Family Burial Garden. The specifications for the Giles Addition were similar to and were designed to complement the original Giles Family Burial Garden. According to Mrs. Giles, the purpose of the Giles Addition was so that additional family members could be laid to rest near immediate family members who were laid to rest in the Giles Family Burial Garden. She explained that Mr. Giles had a sister who had predeceased him and was buried in Buras, Louisiana. Over the years, flooding had caused the tombs in that area to float up, and Mr. Giles "was really bothered by that, and he wanted to bring her over and put her

---

[5] Although Agreement No. 1571 states that the Gileses purchased 54 spaces, the attachment lists 84 spaces.

4

behind him in that second garden. And . . . he wanted to have a place for whatever family needed it."

In furtherance of this plan for the Giles Addition, on April 10, 2013, Mrs. Giles executed Special Projects Purchase Agreement No. SP-1054. This purchase agreement provided for 108 burial spaces with perpetual care, as well as construction materials and labor for construction of a 179 linear foot wall and four corner posts.[6] The location of the 108 burial spaces in Purchase Agreement No. SP-1054 was listed as "Giles Family Garden Extended," but there was no attachment listing the specific spaces assigned. The total price for Agreement No. SP-1054, including perpetual care, was $158,450.00. On May 9, 2013, Mrs. Giles executed a second contract to correct a "math mistake" in Agreement No. SP-1054 concerning how many burial spaces would make up the Giles Addition. This Purchase Agreement No. 1412 conveyed 4 "Developed" Adult Spaces at no charge, plus perpetual care for those spaces for $300.00. Agreement No. 1412 states that these spaces are to be located in the "Giles Extended Family Garden," but no addendum listing the specific burial spaces purchased was attached to the agreement.[7]

At some point, Mrs. Giles executed an undated document entitled "Giles Extended Family Garden Addendum," which states that "The undersigned agrees to transfer, without charge, all their spaces listed on Oak Lane Memorial Park Contract number SP-1054 in Oak Alley Garden to the following spaces in Giles Extended Family Garden: 108[8] Spaces/See Attached Listing." According to Mr. Bonfanti, the land intended for the Giles Addition was still subject to the UCB mortgage and was undeveloped; thus, the plan was to handle this project in the

---

[6] The agreement provides that the price includes "Wall, All Labor – Crane – Materials – Concrete Work – Footings – And Install."

[7] Although there was testimony that Mrs. Giles signed other documents along with the purchase agreements and that she should have been given a listing of the spaces purchased, there was no evidence that this occurred.

[8] The number "108" was crossed out and replaced by a handwritten "112" and initialed, representing the change made in the number of burial spaces conveyed by the May 9, 2013 purchase agreement.

same manner as the original Giles Family Burial Garden, i.e., OLMP would assign Mrs. Giles an equivalent number of spaces in one of the cemetery's existing developed gardens until the land intended for the Giles Addition was released from the mortgage and developed and approved by the Cemetery Board, at which time these spaces would be swapped for the intended spaces. Although Mr. Bonfanti testified that it was OLMP's policy to provide the purchaser with a list of the burial plots purchased, he could not say for certain whether Mrs. Giles was given a list of the assigned plots at the time of purchase.

Following Mrs. Giles's execution of the April 10, 2013 and May 9, 2013 purchase agreements, OLMP began work on the improvements for the Giles Addition, including installation of the concrete foundation around the perimeter and the footings for the corner pedestals on the mortgaged, undeveloped property intended for the Giles Addition and purchasing of additional materials, such as stone and pedestals. However, construction of the improvements was never completed. Furthermore, OLMP failed to deposit the amounts collected from Mrs. Giles for perpetual care into the trust fund, instead spending that money on other business expenses, including payment of a commission to Michael Miller, OLMP's sales manager. Mr. Bonfanti claimed that OLMP attempted to obtain a release of the mortgage on the land intended for the Giles Addition from UCB but was not able to do so.

OLMP was notified by the Louisiana Cemetery Board on February 5, 2014, following an on-site inspection, that it was in violation of Title 8 of the Louisiana Revised Statutes governing cemeteries. The alleged violations concerned perpetual care and merchandise trust funds and the development, solicitation, and sale of mortgaged property. The notice allowed OLMP a period of time in which to provide proof of compliance, failing which an administrative hearing would be held for the purpose of adjudicating the alleged violations. Stacey Fackrell

6

Sklarski, OLMP's bookkeeper, testified that the inspector from the Louisiana Cemetery Board instructed her, following the January 2014 on-site inspection, to prepare the deed for conveyance of interment rights for Mrs. Giles's 2013 purchase, and she did so at that time, attaching the list of the 112 substitute burial plots being temporarily conveyed.

On July 30, 2013, UCB filed suit on the OLMP notes secured by the mortgage, alleging that OLMP had failed to make required payments. On April 10, 2014, just prior to a scheduled hearing on UCB's suit, OLMP sold all of its land, together with all buildings and improvements thereon, to National Information Services, Inc. ("NIS") for the sum of $3,040,000.00. The purchase price was to be paid in the form of $40,000.00 in cash on the date of the sale and delivery of a promissory note payable to OLMP for $200,000.00.[9] The sale price further consisted of the existing UCB multiple indebtedness mortgage, which had an outstanding balance of $2,800,000.00. According to Lawrence Dodd, president and owner of NIS, the purpose of the sale was to protect the cemetery property from seizure by the bank by transferring it out of the hands of OLMP. Mr. Dodd admitted that the deal was put together quickly and the closing of the sale was held on April 10, 2013, because the parties were aware that rendition of a judgment on UCB's suit was imminent.

Contemporaneously with the execution of the sale of the property, OLMP and NIS entered into a Cemetery Management Contract. The Cemetery Management Contract was for an initial term of twenty-five years, with an option for OLMP to renew for five additional ten-year terms if not in default under the contract at renewal. The Cemetery Management Contract provided that OLMP

---

[9] The $200,000.00 note issued by NIS to OLMP as part of the consideration for the purchase of the property specified that default under the Cemetery Management Contract, executed contemporaneously with the sale of the property, would constitute a default on the note, resulting in either immediate acceleration of all sums due on the note (if default by NIS) or stipulated damages in the amount of any sums still due and unpaid under the note (if default by OLMP).

7

would maintain all licenses required to own and operate a cemetery; have the exclusive right to manage and conduct all at-need and pre-need sales of burial rights, burial merchandise (provided by OLMP), and burial services (provided by OLMP); provide, train, and supervise all personnel; file all reports and returns and maintain all records required by any governmental authority with jurisdiction over the cemetery; collect amounts due from purchasers and remit such amounts to NIS; calculate and make deposits into, and provide oversight of, the trust funds; and perform a variety of other managerial functions. With regard to the trust funds, the Cemetery Management Contract also provided:

> Accounts Receivable. It is understood that there exists a deficiency in trust funds referred to hereinabove and certain monuments/memorials/markers have only heretofore been partially paid in advance. Such items are intended to be paid for by the existing receivables and are to become a liability of [NIS]. In so far [sic] as [NIS] will therefore become responsible for any shortage in either the trust funds or any excess costs due for payment on purchase of monuments, freight, and/or installation, an assignment of all outstanding receivables is hereby made to [NIS], all as further shown by the listing of said accounts receivable on Exhibit "D" made a part hereof by reference. It is expressly agreed that the payments mentioned will be paid contemporaneously with the collection of the receivables.

Several days after the sale and execution of the Cemetery Management Agreement, judgment was rendered in favor of UCB and against OLMP and its guarantors for the amounts of $2,805,875.53, plus interest and attorney fees, and $43,592.11, plus interest and attorney fees, and recognizing UCB's mortgage on the OLMP property.

On May 15, 2014, the Louisiana Cemetery Board held an administrative hearing on OLMP's alleged violations. Following the hearing, the Cemetery Board made the following findings: OLMP failed to deposit all of the money it collected for perpetual care into the perpetual care trust fund, resulting in a shortfall of $42,508.20; OLMP failed to deliver merchandise and services for SP-1054 (the Giles Addition) and failed to deposit the required amounts ($33,637.80)

8

in the merchandise trust fund for the undelivered merchandise and services; OLMP used trust funds for other, business purposes; OLMP developed, solicited, and sold mortgaged property for the Giles Addition. Based on its findings, the Cemetery Board issued an order on May 23, 2014, suspending OLMP's Certificate of Authority. OLMP appealed the Cemetery Board's decision to the trial court, but the decision to suspend OLMP's Certificate of Authority was affirmed. The Cemetery Management Contract was terminated as a result of the suspension of OLMP's certificate of authority, and the $200,000.00 note was cancelled by OLMP under the default provisions.[10]

NIS applied for a Certificate of Authority in its own name on June 9, 2014. Despite the fact that NIS filed the application under its own name, it listed the "D/B/A or Trade Name of the Cemetery" as Oak Lane Memorial Park and noted that it would be contracting management of the cemetery to "Oak Lane Memorial Park, LLC." This application was not approved, apparently due to concerns raised by the Cemetery Board regarding management by OLMP and prior encumbrances on the property.

Mrs. Giles filed suit on October 15, 2014 for breach of contract and unjust enrichment and seeking damages and other relief.[11] The OLMP property subject to the mortgage, including the property which was intended for the Giles Addition (and on which the concrete foundation and footings were installed for the Giles Addition), was seized and sold at sheriff's sale on November 19, 2014.

On July 10, 2015, NIS sent a letter petitioning the Cemetery Board to re-open its consideration of NIS's application for a Certificate of Authority. To address the Cemetery Board's concerns regarding OLMP's management of the

---

[10] Mr. Bonfanti also pled guilty to criminal charges relating to his management and operation of the cemetery without a license.

[11] Mrs. Giles also initially sought a declaratory judgment stating that she is the owner of the Giles Addition property and specific performance of the contracts. However, following the seizure and sale of the property intended for the Giles Addition, this was no longer possible.

property, NIS proposed to hire Michael Miller, OLMP's Sales Manager, as a General Manager in order to eliminate the necessity for an outside management organization to be licensed and/or approved by the Cemetery Board. NIS assured the Cemetery Board that no encumbrances existed on the property, as the $200,000.00 promissory note had been cancelled by OLMP and the property subject to the UCB mortgage had been seized and sold. NIS also stated that, "[i]f approved, NIS will use cemetery certificates of interment rights, cemetery sales contracts, and cemetery Rules and Regulations in the exact same form as those previously used by Oak Lane Memorial Park LLC, and approved by this Board. . . . The applicant proposes to do business as 'Oak Lane Memorial Park', and has obtained appropriate permission from Oak Lane Memorial Park LLC to so operate."

Following a bench trial on Mrs. Giles's claims against NIS and OLMP, at which OLMP waived the right to put on a defense, the trial court rendered judgment in favor of Mrs. Giles and against OLMP and NIS, in solido. The court concluded that Mrs. Giles was entitled to rescission of the April 10, 2013 and May 9, 2013 purchase agreements (Nos. SP-1054 and 1412) and return of the entire purchase price of $158,750.00. The court also awarded Mrs. Giles $150,000.00 in damages for her mental anguish, distress, inconvenience, and aggravation.

NIS appealed, assigning the following errors by the trial court:

1.  The court erred in finding that a breach occurred and that NIS was liable as a successor entity for that breach.

2.  The court erred in ordering rescission and return of the full purchase price because Plaintiff received everything she purchased (the rest of what Plaintiff wanted was not promised in the sale but was subject to suspensive conditions which did not occur).

10

3. The court erred in ordering rescission and return of the full purchase price because Plaintiff retained possession of stone monuments and granite items that had been included in the purchase price.

4. The court erred in finding NIS solidarily liable for the full amount of the judgment, where OLMP's owner admitted that he engaged in a crime relating to the cemetery and NIS played no role in causing Plaintiff's damages.

## DISCUSSION

### *Breach of Contract*

NIS first argues that the trial court erred in concluding that a breach of contract occurred because Mrs. Giles received what she bargained for in the April 10, 2013 and May 9, 2013 purchase agreements, i.e., 112 burial plots. NIS contends that Mrs. Giles knowingly and willingly purchased 112 scattered, miscellaneous burial plots on the chance that the property intended for the Giles Addition would later be developed for cemetery purposes, allowing her to trade the scattered spots she purchased for equivalent spots in the Giles Addition. Mr. Bonfanti testified at trial that conveyance of the scattered burial plots still satisfied OLMP's obligation under the contract, because Mrs. Giles could use the burial plots to bury her extended family and, in the event the Giles Addition was ever developed, Mrs. Giles could choose to relocate her deceased family members at that time. When questioned, however, Mr. Bonfanti acknowledged that this was no longer even possible, since the property intended for the Giles Addition had been sold.

Mrs. Giles, on the other hand, denied that she received what she bargained for, asserting that what she bargained for was 112 burial spots in the Giles Addition (adjacent to the Giles Family Burial Garden), with fencing around the entire Giles Addition. Although she admitted that she knew that the bank would

11

have to release the mortgage on the property in order for the Giles Addition to be developed, it was her understanding that "those were [her] spots," and she viewed the release of the mortgage and the development of the property for cemetery purposes as a mere formality. She entered into the contracts to purchase the Giles Addition soon after her husband's death because she knew it was important to him to have his sister buried near him and she wanted to do it for him. Mrs. Giles pointed out that the purchase price also included materials that were never received and labor that was never performed.

The trial court concluded from the evidence presented that Mrs. Giles did not bargain for a large number of scattered burial plots, noting that "[c]ommon sense dictates that elaborate monuments, vases, etc. cannot be constructed around scattered plots." Additionally, the testimony of Mrs. Sklarski, who kept records of the assignment of burial plots to purchasers and prepared deeds for conveyance of interment rights for OLMP, lends further weight to Mrs. Giles's assertion that the scattered burial plots were not what she bargained for. Mrs. Sklarski testified that in preparing the list of the burial plots assigned to Mrs. Giles, she assigned "treed spaces" to Mrs. Giles, which would later be swapped for the intended spots in the Giles Addition, so that the temporary assignment of these spaces would not "hold up" available spaces. The list of "treed spaces" assigned to Mrs. Giles is dated "4/16/2013 12:04PM," although the purchase took place five days earlier on April 11. Thus, it seems unlikely that this list was even provided to Mrs. Giles at the time of the purchase. Further, Mrs. Sklarski noted that the same process of temporarily assigning "treed spaces" until the intended spaces were developed was used when the Gileses purchased the Giles Family Burial Garden, and those spaces were swapped for the correct spaces several months after the purchase.

The essential elements of a breach of contract claim are (1) the obligor's undertaking an obligation to perform, (2) the obligor's failure to perform the

12

obligation (the breach), and (3) the obligee's damages sustained as a result of the breach. See La. Civ. Code art. 1994; *Denham Homes, L.L.C. v. Teche Fed. Bank*, 2014-1576, p. 17 (La.App. 1 Cir. 9/18/15), 182 So.3d 108, 119.

After a thorough review of the evidence, we cannot say that the trial court was manifestly erroneous or clearly wrong in concluding that Mrs. Giles contracted to pay $158,750.00 for the construction of a burial garden for her extended family adjacent to the family's existing burial garden, rather than for 112 scattered burial plots and construction materials which would be useless for scattered burial plots. See *Hayes Fund for First United Methodist Church of Welsh, LLC v. Kerr-McGee Rocky Mountain, LLC*, 2014-2592, p. 8 (La. 12/8/15), 193 So.3d 1110, 1115-16.

Having concluded that the parties contracted for the construction of the Giles Addition on the property adjacent to the Giles Family Burial Garden, including the erection of a fence and corner posts, OLMP's transfer of interment rights in 112 scattered burial spaces and delivery of some (but not all) uninstalled construction materials, was undoubtedly a breach of the agreement between the parties.

*Successor Liability*

NIS next argues that even if a breach occurred, it should not be liable to Mrs. Giles as a successor entity. Generally, when one corporation sells all of its assets to another, the latter is not responsible for the seller's debts or liabilities. *J.D. Fields & Co., Inc. v. Nottingham Const. Co., LLC*, 2015-0723, p. 4 (La.App. 1 Cir. 11/9/15), 184 So.3d 99, 101-02, quoting *Golden State Bottling Co., Inc. v. N.L.R.B.*, 414 U.S. 168, 182 n. 5, 94 S.Ct. 414, 424, 38 L.Ed.2d 388 (1973). However, there are three exceptions to this general rule, where either: (1) the purchaser expressly or impliedly agrees to assume the obligations; (2) the purchaser is merely a continuation of the selling corporation; or (3) the transaction is entered into to escape liability. *Id.* Although Mrs. Giles only had to prove the

13

existence of one exception in order for NIS to be liable as a successor entity, the trial court concluded that all three exceptions applied in this case. See *Joseph v. Apache Stainless*, 97-1350 (E.D. La. 11/17/99), 1999 WL 1049830, at *4 (unpublished opinion).

With regard to the first exception, that the purchaser expressly or impliedly agreed to assume the obligations of the seller, NIS argues that it strictly purchased land, not the cemetery business. The trial court rejected this assertion based on the evidence presented. Although Mr. Dodd testified that NIS only purchased real estate, not the cemetery business, the Cemetery Management Contract, executed contemporaneously with the act of sale, demonstrates NIS's intent to purchase the cemetery business as well as the land. The Cemetery Management Contract refers to NIS as "the Cemetery" and states that "the Cemetery recognizes that its principal source of income is the proceeds from the sale of Burial Rights." The agreement further provides that the Cemetery's existing trust fund deficiencies will be paid for by existing receivables, which were assigned to NIS, and will become a liability of NIS as owner of the Cemetery. In fact, NIS ultimately paid the fund deficiencies after Mr. Bonfanti collected receivables following the sale and failed to use that money to repay the deficiencies. We find no error in the trial court's finding that NIS expressly or impliedly agreed to assume OLMP's obligations.

With regard to the second exception, referred to as the "continuation doctrine," the key consideration is whether the successor is, in fact, a "continuation" of the predecessor. *J.D. Fields*, 2015-0723 at p. 6, 184 So.3d at 103. The extent to which a predecessor and successor have common shareholders, directors, officers, or even employees are pertinent considerations. *Id.* Further, prior business relationships should be considered, as should the continuity of the identity of the business in the eyes of the public. *J.D. Fields*, 2015-0723 at p. 7, 184 So.3d at 103, citing *Bourque v. Lehmann Lathe, Inc.*, 476 So.2d 1125, 1127

14

(La.App. 3d Cir. 1985). However, Louisiana courts have held that a threshold requirement to trigger a determination of whether successor liability is applicable under the continuation exception is that one company must have purchased all or substantially all the assets of another. *Id.*, citing *Pichon v. Asbestos Defendants*, 2010-0570, p. 6 (La.App. 4th Cir. 11/17/10), 52 So.3d 240, 244, *writ denied*, 2010-2771 (La. 2/4/11), 57 So.3d 317; *Camsoft Data Systems, Inc. v. Southern Electronics Supply, Inc.*, 2019-0732, p. 7 (La. App. 1 Cir. 7/2/19), 2019 WL 2880873 at *3 (unpublished opinion).

NIS argues that there is no evidence that NIS bought all of OLMP's assets, and further notes that "no 'receivables' changed hands because OLMP/Bonfanti spent/took them all" and OLMP did not sell its valuable cemetery license as part of the transaction. Contrary to these assertions, Mr. Bonfanti testified at trial that NIS bought "[e]verything . . . the entire operation." Further, the Cemetery Management Contract provided that NIS, as owner of the Cemetery, "has good and marketable title to the assets, all those used in the conduct of the businesses, as well as those otherwise on the Cemetery's books and records as being owned as of the date thereof, and those purchased since that date." NIS's argument that no receivables changed hands is likewise not persuasive. The Cemetery Management Contract executed by NIS and OLMP as part of the sale states that "an assignment of all outstanding receivables is hereby made to [NIS]" and that OLMP, as manager, would use the receivables to pay for the trust fund deficiencies "contemporaneously with the collection of the receivables." Thus, the receivables were not expected to be transferred to NIS; rather, the money was intended to be deposited into the trust funds to correct the deficiencies immediately upon receipt. The fact that Mr. Bonfanti did not use all collected receivables to pay the trust fund deficiencies as required by the Cemetery Management Agreement does not change the fact that the receivables were assigned to NIS at the time of the sale. Finally,

15

while Mr. Bonfanti did agree that OLMP's license was not transferred in the sale, transfer of a license or certificate of authority to a purchaser is not allowed under the law. Louisiana Revised Statutes 8:407 provides that following the sale or transfer of ownership or control of a cemetery sales or management organization,[12] the transferor organization must return its license to the Louisiana Cemetery Board and the transferee must apply for a new license.[13] Likewise, following the sale or transfer of ownership or control of a cemetery or cemetery authority,[14] the transferor must return its certificate of authority to the Louisiana Cemetery Board and the transferee must file an application for its own certificate of authority.[15] La. R.S. 8:76. Thus, we find no error in the trial court's finding that NIS purchased all or substantially all of the assets of OLMP.

Having established the threshold requirement of a sale of all or substantially all of the assets of OLMP to NIS, we now turn to whether NIS is merely a continuation of OLMP. In finding that it was, the trial court noted that the name "Oak Lane Memorial Park, LLC" continued to be used in business documents as late as November 2015, over a year and a half after NIS purchased the Cemetery. In addition to informing the Louisiana Cemetery Board in July 2015 that it had acquired the right to do business as "Oak Lane Memorial Park" from OLMP around the time of the sale, Mr. Dodd signed a November 10, 2015 collection letter as "Manager" of "Oak Lane Memorial Park, LLC" and a November 12, 2015 purchase agreement as the "Owner" of "Oak Lane Memorial Park, LLC."

---

[12] A "cemetery sales organization" is a legal entity contracting as an independent contractor with a cemetery authority to conduct sales of cemetery spaces, whether by deed, servitude, grant of right to use or otherwise, and/or cemetery products. A "cemetery management organization" is a legal entity contracting as an independent contractor with a cemetery authority to manage a cemetery. La. R.S. 8:1(10) and (11).

[13] A license issued by the Louisiana Cemetery Board is required before a cemetery sales organization or a cemetery management organization may engage in business. See La. R.S. 8:401.

[14] A "cemetery authority" is a person, firm, corporation, limited liability company, trustee, partnership, association, or municipality owning, operating, controlling, or managing a cemetery or holding lands within this state for interment purposes. La. R.S. 8:1(8).

[15] A valid certificate of authority is required prior to engaging in the operation or conduct of a cemetery business, including but not limited to the sale of cemetery merchandise, lots, or other interment spaces. La. R.S. 8:72(B).

Additionally, Mr. Dodd represented to the Louisiana Cemetery Board that NIS would hire the former OLMP sales manager as a general manager and, if NIS's application for a certificate of authority was approved, it would continue to do business as "Oak Lane Memorial Park" and use cemetery certificate of interment rights, cemetery sales contracts, and cemetery rules and regulations in the exact same form as those previously used by OLMP, evidencing an intent to continue the business started as Oak Lane Memorial Park, LLC. The trial court also noted the "commonality of personnel" between OLMP and NIS: Mr. Bonfanti, OLMP's Member/Manager, managed operations of the cemetery before and after the sale to NIS; Ms. Sklarski was the bookkeeper for the cemetery both before and after the sale to NIS; and Michael Miller, the cemetery's sales manager before and after the sale, was hired by NIS as general manager of the cemetery after OLMP's certificate of authority was suspended. Finally, the trial court noted that the cemetery continues to be known to the public as "Oak Lane Memorial Park," which combined with the representations made to the Louisiana Cemetery Board and the commonality of key personnel make it clear that NIS is a continuation of the business purchased from OLMP. NIS introduced a July 16, 2015 notarized letter from Mr. Bonfanti, which purports to clarify "the relationship between our respective companies, and the relationship between [Dodd] and [Bonfanti] as individuals," and states that his actions following the date of the sale were taken solely on behalf of OLMP, not NIS, and that neither NIS nor Mr. Dodd had any knowledge of the day-to-day operations of the cemetery. While this letter actually tends to lend more weight to the assertion that NIS was merely a continuation of OLMP, Mr. Bonfanti testified that this letter was not his statement, but rather was prepared by Mr. Dodd without his input and presented to him for signature. Considering the evidence before the court, we find no error in the trial court's conclusion that NIS was a continuation of OLMP's business.

17

The third exception to the general rule that a successor entity is not liable for the debts and liabilities of its predecessor is where the transaction was entered into to escape liability. Where parties seek to destroy the remedies of third parties through the voluntary sale of all or substantially all of a company's assets, that in itself provides a reason to impose liability on the successor entity. *Bourque*, 476 So.2d at 1127. In this case, as noted by the trial court, Mr. Dodd, an attorney, admitted that he was aware of the impending foreclosure proceedings prior to the sale and testified that he and Mr. Bonfanti and Jerry Fackrell (Ms. Sklarski's father, who also had an ownership interest in OLMP) devised the plan for NIS to purchase OLMP in order to avoid having the OLMP property subject to seizure by the bank because the property was valuable. In fact, he testified that the sale had been put together quickly in order for the closing to take place prior to the upcoming hearing on UCB's suit on the note. As such, the trial court did not err in finding that Mrs. Giles successfully proved that the sale was entered into to escape liability. This assignment of error is without merit.

*Remedy for Breach*

NIS argues that the trial court erred in ordering rescission of the sale and return of the full purchase price as a remedy for the breach, since according to NIS, Mrs. Giles received everything she bargained for in the contract and she retained possession of some construction materials (stone monuments and granite items) that were purchased for the Giles Addition.

As discussed above, Mrs. Giles did not get what she bargained for in the Giles Addition contracts, i.e., a burial garden adjacent to the existing Giles Family Burial Garden in a perpetual care cemetery, containing 112 burial spaces and surrounded by fencing and corner posts. The trial court rejected NIS's argument that the items not received by Mrs. Giles were subject to suspensive conditions which did not occur, and we found no error in the trial court's conclusion. OLMP

18

breached its obligations under the purchase agreements by failing to provide what was bargained for. When a contract is breached, the courts are authorized, within their sound discretion, to grant dissolution. *Henry v. Hodges*, 323 So.2d 207, 211 (La.App. 1 Cir. 1975). Mrs. Giles testified that her motivation for purchasing the Giles Addition was to fulfill her deceased husband's desire to have a place for their extended family to be buried alongside the immediate family in the Giles Family Burial Garden. A large number of burial plots scattered across the cemetery in "treed spaces" would not accomplish this. The concrete foundation and footings for the wall and corner posts installed on the land intended for the Giles Addition, which is now owned by someone else, is likewise worthless to Mrs. Giles. OLMP certainly knew or should have known that these scattered burial spaces and construction materials were not what Mrs. Giles intended to purchase. Under these circumstances, the trial court did not abuse its discretion in ordering rescission of the sale and return of the full purchase price.

With regard to NIS's argument that the court erred in ordering return of the full purchase price since Mrs. Giles retained possession of some stone monuments and granite items that were purchased by OMLP for use in the Giles Addition, we agree that Mrs. Giles should not be allowed to retain any of the construction materials in her possession upon rescission of the sale and return of the full purchase price. As such, the trial court judgment is amended to order that Mrs. Giles return any construction materials she received, which were purchased by OLMP for the Giles Addition.

*Solidary Liability*

NIS's final assignment of error is that the trial court erred in finding it solidarily liable with OLMP for the entire amount of the judgment, where Mr. Bonfanti, as OLMP's Member/Manager, pled guilty to criminal charges involving the management and operation of the cemetery.

19

Under Louisiana law, "[a]n obligation is solidary for the obligors when each obligor is liable for the whole performance. A performance rendered by one of the solidary obligors relieves the others of liability toward the obligee." La. C.C. art. 1794. An obligee, at his choice, may demand the whole performance from any of his solidary obligors, and a solidary obligor may not request division of the debt. La. C.C. art. 1795. Among solidary obligors, each is liable for his virile portion. If the solidary obligation arises from a contract or quasi-contract, virile portions are equal in the absence of agreement or judgment to the contrary; however, where the solidary obligation arises from an offense or quasi-offense, a virile portion is proportionate to the fault of each obligor. A solidary obligor who has rendered the whole performance, though subrogated to the right of the obligee, may claim from the other obligors no more than the virile portion of each. La. C.C. art. 1804.

In this case, the solidary liability arises from a breach of contract, making the virile portions of OLMP and NIS equal in the absence of a judgment or agreement to the contrary. Thus, under the above principles of solidary liability, Mrs. Giles, as obligee, may choose to demand performance of the entire obligation from either solidary obligor, who is then subrogated to her rights against the other solidary obligor and may demand the virile portion from the non-paying solidary obligor.

NIS argues that the court should have assigned a larger virile portion to OLMP, because the circumstances giving rise to the cause of action occurred before NIS became involved in the cemetery business. This argument does not have merit. NIS's liability in this case arose via its status as a successor entity; not because NIS itself breached the contract. If NIS's liability were based strictly on NIS's actions, the exceptions to the general rules against successor liability would be meaningless. As the third circuit in *Bourque* noted, the circumstances constituting the exceptions that create successor liability, such as where parties

20

seek to destroy the remedies of third parties through the voluntary sale of all or substantially all of a company's assets, provide a reason to impose liability, both in contract and in tort, on the successor entity for the obligations of the predecessor. *Bourque*, 476 So.2d at 1127.

NIS also argues that the court erred in awarding damages to Mrs. Giles, because she knowingly undertook the risk that the suspensive conditions in the contract might not occur. We have already rejected this argument, as we do not believe the trial court erred in concluding that a breach occurred. This argument has no merit.

## CONCLUSION

For the reasons set forth herein, the judgment of the trial court is amended strictly to provide that Mrs. Giles is ordered to return any construction materials she received that were purchased by OLMP for the Giles Addition. As amended, the judgment is affirmed. Costs of this appeal are assessed to defendant, National Information Services, Inc.

**AMENDED AND, AS AMENDED, AFFIRMED.**